UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL ACTION NO. |
| | ) | 5:22-cr-58-1 |
| v. | ) | |
| | ) | |
| SERHAT GUMRUKCU, | ) | |
| Defendant. | ) | |


JURY TRIAL EXCERPT - TESTIMONY OF MELISSA DAVIS
Monday, March 17, 2025
Burlington, Vermont


BEFORE:

    THE HONORABLE CHRISTINA C. REISS,
    Chief District Judge, and a Jury


APPEARANCES:

PAUL J. VAN DE GRAAF, AUSA, and ZACHARY B. STENDIG, AUSA, U.S.
    Attorney's Office, 11 Elmwood Avenue, 3rd Floor, P. O. Box
    570, Burlington, VT 05402-0570, Counsel for the Government

SUSAN K. MARCUS, ESQ., Law Firm of Susan K. Marcus, 29
    Broadway, Suite 1412, New York, NY 10006, Counsel for the
    Defendant

ETHAN A. BALOGH, ESQ., Balogh & Co. APC, 100 Pine Street, Suite
    1250, San Francisco, CA 94111, Counsel for the Defendant

SERHAT GUMRUKCU, DEFENDANT


Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

INDEX TO EXAMINATIONS

WITNESS                                                              PAGE

MELISSA DAVIS
      Direct by Mr. Van de Graaf                                        4
      Cross by Mr. Balogh                                              38
      Redirect by Mr. Van de Graaf                                     81
      Recross by Mr. Balogh                                            82

INDEX TO EXHIBITS

GOVERNMENT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| 1 | Photograph of Gregory Davis, Bates 9743 | 6 | 7 |
| 2 | Map of Danville and Vermont, Bates 13430 | 9 | 10 |
| 3 | Aerial View of Hawkins Road and North Danville, Bates 13428 | 11 | 11 |
| 4 | Aerial View of 884 Hawkins Road, Bates 13423 | 12 | 12 |
| 5 | Photograph of 884 Hawkins Road, Bates 8201 | 13 | 13 |
| 6 | Photograph of 884 Hawkins Road, Bates 7301 | 15 | 33 |
| 7 | Photograph of 884 Hawkins Road - Vehicle in Driveway, Bates 7995 | 33 | 34 |
| 9 | Photograph of White SUV in Davis Driveway, Bates 13427 | 35 | 35 |
| 10 | Close-up of License Plate, Bates 7302 | 35 | 36 |
| 11 | Photograph of Davis Family, Bates 13429 | 5 | 5 |
| 222A | Gregory Davis U.S. Passport, Bates GAC-586 | 8 | 9 |

INDEX TO EXHIBITS
(Continued)

| DEFENDANT EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| II7 | Mode Commodities LLC TD Bank Statement, Bates 464 | 50 | 50 |
| II8 | Quadrant Financial Group Wells Fargo Statement, Bates 514 | 61 | 64 |
| II9 | Mode Commodities LLC TD Bank Statement, Bates 514 | 52 | |
| II10 | Mode Commodities LLC TD Bank Statement, Bates 376 | 68 | 69 |
| NN3 | 2015 Davis Tax Return (Redacted), Bates A-07 | 42 | 44 |
| NN4 | Case 15-CVS-003319, Bates 7080 | 77 | |
| NN7 | 2016 Davis Turbo Tax Federal Return (Redacted), Bates A-25 | 70 | 71 |
| NN15 | Selection of Cellebrite Extraction of Device A-07 by Megan Sheridan, Bates A-07 | 75 | |

Melissa Davis - Direct

Monday, March 17, 2025

(The following was held in open court at 10:52 AM.)

MR. VAN DE GRAAF:  Your Honor, the Government calls Melissa Davis.

COURTROOM DEPUTY:  Ms. Davis, you can step right in front of me.  Please raise your right hand.  State your full name for the record.

THE WITNESS:  Melissa Davis.

MELISSA DAVIS,

having been first duly sworn by the courtroom deputy,

was examined and testified as follows:

THE WITNESS:  Absolutely.

DIRECT EXAMINATION

BY MR. VAN DE GRAAF:

Q    Good morning, Ms. Davis.  There's a microphone right there if you need it.

A    Okay.  Sorry.  Nervous.

Q    Ms. Davis, are you married now?

A    No, I am not.

Q    Were you married before?

A    I was.

Q    Who was your husband?

A    Gregory Davis.

Q    What happened to Mr. Davis?

A    He was taken.  He was arrested at one point.

Melissa Davis - Direct

Q    How did your marriage end?

A    He was murdered.

Q    I'd like to show you what's marked for identification on your computer as Government Exhibit 11.  Do you recognize what I've put on the screen as Exhibit 11?

A    It's not on --

Q    What's that?

A    There's nothing here.  Oh, I got it.

I do.

Q    Can you tell the jury what it is?

A    It's my husband and I.

Q    Photograph?

A    It's a photograph of my husband and I.

MR. VAN DE GRAAF:  Your Honor, I'd move the admission of Government Exhibit 11.

THE COURT:  Any objection?

MR. BALOGH:  No, Your Honor.

THE COURT:  It's admitted.

(Government Exhibit 11 was received in evidence.)

MR. VAN DE GRAAF:  We can show it to the jury.

THE COURT:  Yes.

Q    BY MR. VAN DE GRAAF:  Ms. Davis, do you remember when this picture was taken?  How long ago was it taken?

A    Yes.  That's when we lived in Staten Island.  We had two of our kiddos.  I would say 2008, maybe.

Melissa Davis - Direct

JUROR:  It's not here.

THE COURT:  Oh, you're not seeing it on the screen. And that's exactly what we need you to do.  And the other thing I should tell you is that the screens tilt, so if that makes it easier for you, you can tilt the screens around.

COURTROOM DEPUTY:  Tilting may dislodge the connection.

THE COURT:  Don't tilt too much.

COURTROOM DEPUTY:  Yeah.  Don't tilt too much.

Q    You mentioned kiddos.  How many children did you have with Gregg Davis?

A    We have seven.

Q    Seven?

A    Yes.  A completion.  Yes, seven.

Q    And at present, what is the age ranges of those children?

A    Six to 20.

Q    I'd like to just show you two more pictures.  Showing you what's marked for identification as Government Exhibit 1.  Do you see that on the screen?

COURTROOM DEPUTY:  She may not.  Hold on.

A    Not yet.

COURTROOM DEPUTY:  How about now?  No?

A    Yes, I -- it was there.

Q    And what's --

COURTROOM DEPUTY:  Not yet, Paul.

Melissa Davis - Direct

MR. VAN DE GRAAF:  I'm trying to do the electronic thing here.

COURTROOM DEPUTY:  I know.  I'm trying to do it too. Do you happen to have a paper copy?

MR. VAN DE GRAAF:  I do.

COURTROOM DEPUTY:  If you could pass that up. Apparently everything's showing.

MR. VAN DE GRAAF:  If I could approach, Your Honor.

THE COURT:  Yes, you may.

Q    Showing you what's marked for identification as Government Exhibit 1.  Do you recognize that?

A    I do.

Q    And what is it?

A    It's a picture of Gregg.

MR. VAN DE GRAAF:  Your Honor, I'd move the admission of Government Exhibit 1.

THE COURT:  Any objection?

MR. BALOGH:  None, Your Honor.

THE COURT:  It's admitted.

(Government Exhibit 1 was received in evidence.)

Q    BY MR. VAN DE GRAAF:  And do you recall about how old Gregg was when this picture was taken?

A    Oh, my gosh.

Q    Is that what he looked like around the time he died?

A    Thirty-four, 35.

Melissa Davis - Direct

Q    What's that?

A    Thirty-four, 35.

Q    Okay.

A    Yeah.  We definitely were together then.

MR. VAN DE GRAAF:  Did you show the jury that Exhibit 1?

THE COURT:  Yes.

COURTROOM DEPUTY:  Yes.

Q    Showing you what's marked for identification as Government Exhibit 222 -- 222A.  Do you recognize what's depicted there?

COURTROOM DEPUTY:  Mr. Van de Graaf, I think I've got it set now if you want to go back too.

MR. VAN DE GRAAF:  Go back to trying the electronic version?

COURTROOM DEPUTY:  Yes.

Q    Showing you on the screen what's marked as Exhibit 222A, do you recognize it?

A    I do.

Q    And what is it?

A    It's Gregg's passport.

Q    And is it a fair depiction or photograph of your husband's passport?

A    It is.

MR. VAN DE GRAAF:  Your Honor, I move the admission of 222A.

Melissa Davis - Direct

THE COURT: Any objection?

MR. BALOGH: We object only as subject to redaction. There's PII that needs to be redacted under Rule 49.1, including his passport number and date of birth. Apart from that being redacted before it goes back to the jury, we have no objection to the exhibit, but we expect compliance with 49.1 for the witness' protection.

THE COURT: We're not going to redact his birth date. His passport number, it's probably been canceled at this point in time, but we can have that redacted.

The exhibit is admitted.

(Government Exhibit 222A was received in evidence.)

Q    BY MR. VAN DE GRAAF: Ms. Davis, in early January of 2018, where did you live?

A    2018. We were living in Danville, Vermont.

Q    I'd like to show you what's marked for identification as Government Exhibit 2 for -- it should be on your screen. Do you see it there?

A    Yes.

Q    What is depicted in Exhibit 2?

THE COURT: It's now off again.

THE WITNESS: I'm sorry.

THE COURT: So -- that's okay. It's certainly not your problem.

COURTROOM DEPUTY: It should be on.

Melissa Davis - Direct

THE COURT:  It's coming.

THE WITNESS:  It's there.

COURTROOM DEPUTY:  There we go.

Q    What's depicted in Exhibit 2?

A    I see a map of the Danville area.

Q    And based upon your living in Danville, is that a fair representation of northern Vermont?

A    It is.

MR. VAN DE GRAAF:  Your Honor, I move the admission of Exhibit 2.

THE COURT:  Any objection?

MR. BALOGH:  None, Your Honor.

THE COURT:  It's admitted.

(Government Exhibit 2 was received in evidence.)

Q    BY MR. VAN DE GRAAF:  Showing members of the jury that may not know the area well, is this Danville depicted here?

A    Yes.  You're right.

Q    And over on the left side, is that Burlington, where we are right now?

A    Yes.

Q    What kind of house did you have in Danville in early January of 2018?

A    An old white farmhouse.

Q    Was it relatively remote from other houses in the area?

A    It was.

Melissa Davis - Direct

Q    Let me show you what's marked as Government Exhibit 3 for identification.  Do you see that document in front of you?

A    I see it.

Q    I'm going to try to clear --

COURTROOM DEPUTY:  I got it, Paul -- Mr. Van de Graaf.

A    Yeah.  I have it.

Q    What's depicted in Exhibit 3?

A    I see where we lived, 884 Hawkins Road.

Q    And some roads nearby; is that correct?

A    Yes.

Q    And based upon your experience living there, is this a fair depiction of your neighborhood, so to speak?

A    It is.

MR. VAN DE GRAAF:  Your Honor, I move the admission of Exhibit 3.

THE COURT:  Any objection?

MR. BALOGH:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 3 was received in evidence.)

MR. VAN DE GRAAF:  And can the jury see it now?

THE JURORS:  Yes.

Q    BY MR. VAN DE GRAAF:  And so I think you said you lived on Hawkins Road, and I think that's depicted on the map there.  Is that accurate?

A    That is correct.

Melissa Davis - Direct

Q     And you said that this is where the farmhouse was there or where the 884 Hawkins Road is?

A     That's correct.

Q     It doesn't look like there are many neighbors nearby.

A     No.

Q     Next let me show you what's marked for identification as Exhibit 4.  Do you see that?

A     Yes, I do.

Q     And what's depicted there?

A     A bird's-eye view of the home we were living in.

Q     Is that a fair depiction -- fair and accurate depiction of the layout of your property back in 2018?

A     It is.

        MR. VAN DE GRAAF:  Your Honor, I move the admission of Exhibit 4.

        THE COURT:  Any objection?

        MR. BALOGH:  None, Your Honor.

        THE COURT:  It's admitted.

    (Government Exhibit 4 was received in evidence.)

        MR. VAN DE GRAAF:  Show it to the jury.

Q     BY MR. VAN DE GRAAF:  So it looks like there's a building there and a building there.  Can you just describe what those two buildings were.

A     The one with the red roof was our home, and the one with the green roof across the street where you see the cars was an

Melissa Davis - Direct

old garage with our, like, heating source attached.

Q    Your what?  Your heating?

A    Heating source.  We had an outdoor, like -- I forgot. It's -- you throw the wood in.

Q    Furnace or whatever?

A    Yes.  A furnace.  I'm sorry.

Q    And what did you -- what did you power the furnace with?

A    Wood.

Q    Next I'd like to show you what's marked for identification as Government Exhibit 5 in front of you.  Do you see it there?

A    Not yet.  Yes, I see it.

Q    And what's depicted in Exhibit 5?

A    The front door of the house that we were living in.

Q    And is that a fair depiction of your property in early January 2018?

A    Yes, it is.

        MR. VAN DE GRAAF:  Your Honor, I move the admission of Exhibit 5.

        MR. BALOGH:  No objection.

        THE COURT:  Admitted.

    (Government Exhibit 5 was received in evidence.)

Q    BY MR. VAN DE GRAAF:  And finally for this set, showing you what's -- well, let me show the jury.

    Maybe I'll stop right here.  And while this is up, were you renting, or did you own the property?

Melissa Davis - Direct

A    No.  We were in the process of purchasing it.

Q    Of purchasing it?

A    Yes.

Q    Did you have a plan for when you would close on the house or complete the purchase of the house?

A    We were closing February 3rd, 2018.

Q    So about a month after --

A    Yes.

Q    -- the time we're talking about right now?

A    Yes.

Q    Now, you said the "front door."  It looks like there's two doors here in this picture.  Looks like there's one there.  Is that a door where I've put a second X to the right of that?

A    No.  To your left, you can't really see the door.  That window -- I'm sorry.  No.  Go over to the --

Q    Okay.

A    Okay.  You see the wooden door?  That was the front entry, and --

Q    That's this door right here?

A    Yes.  And then the window all the way at the corner, in front of there, there's, like, a pillar.  You can't really see it.  The door was on the side.  Yes.

Q    So behind that pillar, there was a second door?

A    That's correct.

Q    Finally showing you what's marked for identification as

Melissa Davis - Direct

Government Exhibit 6, do you see that in front of you?

A     Yes, I see it.

Q     And what's depicted in Exhibit 6?

A     Attachment to the house.  It was an old barn, and then where you see the driveway, we had finished that.  We had a huge schoolroom upstairs.

Q     So this was sort of attached to the other part of the house we saw?

A     Yes.

Q     And you said something about you refinishing.  Were you working on renovating the house while you were living there?

A     We were renovating it, yes.

Q     And you said something about renovating the upstairs room. Is that the room with these windows right here?

A     Yes.  That's correct.

Q     What were you -- what was the purpose of that room that you were renovating?

        MR. BALOGH:  Objection.  Relevance.

        THE COURT:  I'll allow it.

A     It was just a big schoolroom.  Gregg wanted to give me a nice schoolroom for the kids.

Q     Were you homeschooling the children?

A     I was.

        MR. VAN DE GRAAF:  You can take that off, Jen.  Thank you.

Melissa Davis - Direct

Q    Let me draw your attention to January 6th, 2018.  Do you remember what day of the week that was?

A    It was a Saturday.

Q    Do you remember what the weather was like that day?

A    It was cold.

Q    Well, January in Vermont --

A    It was very cold.

Q    Do you remember what was happening in the house that day, what people were doing?  What were you doing; what was Gregg doing in the house that day?

A    Well, he had just come over from being sick that Saturday morning.  He welcomed the kids to come in our room, and he was just talking with them about his trip to Israel, and we had Christian music on, and then he told them he had a surprise and that Mommy was pregnant.

          MR. BALOGH:  I'm going to object to the narrative, and I'm going to object --

          THE WITNESS:  That's fine.  Sorry.

          THE COURT:  Sure.  So let's make sure we stick with relevance, and let's continue.

     And go forward.

Q    Was anybody working around the house that day?

A    My husband was.

Q    You say you were pregnant.  How were you feeling that day?

A    Nauseous.

Melissa Davis - Direct

Q     How did you feel about having another child?

        MR. BALOGH:  Objection, Your Honor.

        THE COURT:  Sustained.

        MR. BALOGH:  Relevance.

        THE COURT:  Sustained.

Q     Could we go to the evening around 9 o'clock.  Where were you at around 9:00 that night?

A     I was in the bedroom.

Q     Was anybody with you in the bedroom?

A     Gregg was.

Q     Anybody else?

A     Our little -- our son, our youngest son.

Q     What were you doing at around 9 o'clock that evening in the bedroom?

A     I was watching the news.

Q     If we could go back to Exhibit 5 that's been admitted. Can you explain to the members of the jury, where was the bedroom that you and Gregg shared in the house, using Exhibit 5 to describe it?

A     The three windows left of the wooden door.

Q     That's right here?

A     Yes.

Q     Where I'm circling?

A     Yes.  And then there is a -- a window behind that.  You see where the cars are?  It's a -- what is that window called?

Melissa Davis - Direct

But it's behind -- our bedroom was behind the living room.

Q    Is this this window you're describing there?

A    Yes.  Yes.  The bay window.

Q    And your bedroom was where -- sort of connected to that bay window?

A    Yes.  That was our bedroom.

Q    On the first floor?

A    Yes.

Q    Where were the rest of the kids?

A    They were upstairs in their bedroom.

Q    Did anything happen around 9 o'clock to draw your attention away from Gregg and the TV?

A    Yes.

Q    What happened?

A    The dog was barking.

Q    What did you think it was?

A    I wasn't sure.  I thought -- my daughter was caring for black cats, and I thought the cat was, you know, triggering a response.

Q    What did you do about the barking?

A    I asked Gregg to deal with it.

Q    What did Gregg do after you told him to deal with it?

A    He left the room, and then shortly he came back and he -- he was startled.  He was confused.  And he said, "I don't understand.  I'm being arrested."

Melissa Davis - Direct

Q    About how long was he out of the bedroom between the time you told him to go check on the dog and him coming back?

A    A minute or two.

Q    What did you do when you heard that?

A    I jumped up and I said, "What?"

Q    Did you go anyplace?

A    Not at the moment.

Q    Did you speak with him briefly?

A    I did.  I told him I was exasperated.

Q    After you spoke with him for a time, did you go anywhere in the house?

A    I left the bedroom and I went into the hallway that's attached to the -- I guess the dining room, which allows me to see where that door was that you had circled, and I saw a man standing there.

Q    Did you -- so you saw a man.  Did you go to the door that he was at, or did you go back to the bedroom?

A    I went back to the bedroom.

Q    What happened when you got back to the bedroom?

A    I just -- I was -- I was giving my concern to Gregg that I didn't know what was going on and I needed him to explain it, and he didn't know how to because he didn't know what was going on either.

Q    After this other conversation in the bedroom, did you go back out of the bedroom again?

Melissa Davis - Direct

A    I did.

MR. BALOGH:  Objection, Your Honor.  Leading.

THE COURT:  Let's stick with "What happened next?"

Q    After this brief conversation with your husband, what did you do?

A    I did leave the room at that point.  I went to the door while holding my youngest son, and I said, "Where are you taking my husband?"

Q    So let me slow you down just to say what door it is.  We've talked about these two doors.  Which door was the door you went to?

A    The one at the side of the house, behind the pillar.

Q    This door --

A    Yes.

Q    -- is where you went?

A    That's correct.

MR. BALOGH:  If we're going to mark it, I don't -- I just want a clear record of which is "this door," and I'm not understanding.  Can we just get that clarified, please?

Q    Are we talking about the door behind the pillar?

A    The kitchen door.  We'll say that's the kitchen door, and the brown door was the main door.

Q    Thank you.  Now, I think you said that you said something to the person?

A    I did.

Melissa Davis - Direct

Q    What did you say?

A    "Where are you taking my husband?"

Q    Did he say anything?

A    He just said, "Virginia."

Q    Did you get a chance to look at the man at the kitchen door?

A    I did.

Q    What was he wearing on his face or head?

A    A black ski mask with a "U.S. Marshal" emblem; black coat, and it had, like, a vest over it, and it had numbers, and it said "U.S. Marshal."

Q    Did you see any firearms?

A    Yes.

Q    What kind of firearm?

A    He was holding, I guess, like -- like -- I always said it's an AR.  It looked like an AR to me.

Q    Some kind of rifle?

A    Yeah, it was a rifle.

Q    Did you see any law enforcement accessories on this person standing at the door?

A    Yeah.  Handcuffs.

Q    Could you tell anything about his skin color or his race standing at the kitchen door?

A    Yeah.  I assumed he was white only because I saw enough of his complexion that I knew he was fair.

Melissa Davis - Direct

Q    What happened next after you were at the door with this person who was wearing some marshal attire?  Where did you go?

A    I closed the door and I went back to Gregg and I just -- I just -- I did what normal women do, said, "What is going on?" And I was questioning him, and he didn't really have any answers.

Q    Where did Gregg go after that?

A    After that --

Q    After you had this conversation with him back in the bedroom.

A    He was -- he was heading out to the door to leave, and then he turned as though to go upstairs, and he wanted to tell the kids, and I told him, "No.  I'll deal with the kids.  You just get this worked out."  And so he left.

Q    Before he left, did you interact with him at all?

A    I did.  I told him, you know, "Please call me as soon as possible," and then he kissed me and he told me that he loved me.

Q    After that, did you -- what did you do as he was leaving?

A    I heard him say, "I have children," but I didn't really watch it.  My back was against the window.  And then my second youngest son came down, and he was upset --

        MR. BALOGH:  Objection.  We're going to have some hearsay -- I don't want her to repeat anybody else's testimony. She can describe what he did, not what he said.

Melissa Davis - Direct

THE WITNESS:  Okay.

THE COURT:  She's describing his demeanor, and that's permissible.

Don't tell us what the child said.

And let's go forward, Mr. Van de Graaf.

Q    Without saying anything about what your child said, what did you do?

A    I immediately brought -- I escorted him upstairs to one of the kids' rooms.  We got -- we all sat together in their room.  We prayed for their dad.  I told them that --

Q    Let's not talk about what you told them.

A    Okay.  I'm sorry.

Q    Before you went upstairs, did you see any lights associated with the vehicle in the driveway?

A    I saw -- yes, I did.

Q    Can you describe what you saw.

A    Just red and blue lights.

Q    Did you get a good look or any look at the vehicle itself?

A    Not really.  I didn't.

Q    Did you see your husband, Gregg, alive again after that?

A    No, I didn't.

Q    Ms. Davis, did you have any experience with law enforcement before that night?

A    No.

Q    Did you call the police that night?

Melissa Davis - Direct

A    I didn't.

Q    Why not?

A    Law enforcement had just taken my husband.

Q    What did you do that night after Gregg left the house with this person wearing marshal attire?

A    I prayed, and then I searched online for "marshal."  I went to the -- I found the marshal -- U.S. Marshals in Virginia and I took the number down, and I knew I was going to call immediately in the morning.

Q    Did you get any sleep that night?

A    No.

Q    Did you try to contact Gregg after he left?

A    I did.

Q    What did you try to do?

A    I just text him.

Q    Did you hear back?

A    No.

Q    Let me take a moment and go back in time.  How did you meet Gregg?

A    I met him in church in Staten Island.

Q    When did you get married?

A    June 2023.  Sorry.  2023.  2003.  Sorry.

Q    2003.  You mentioned church.  Was church important in your marriage?

A    Absolutely.

Melissa Davis - Direct

Q    Where did you live when you got married to Gregg?

A    In Staten Island.

Q    Were you from Staten Island?

A    Yes.

Q    Where was Gregg from?

A    Brooklyn.

Q    What did Gregg do for work at the time you got married?

A    He was driving trucks.

Q    What did you do for work at the time you got married?

A    I was doing HR in a hospital.

Q    After the kids were born, did you work outside the home?

A    No.

Q    Did Gregg get a different line of work after trucking? Did he change --

A    He did.

Q    -- jobs?

     Very briefly, can you describe his career path in your early marriage.

A    Yeah.  He did foreign direct investment.  He bought -- helped the economy of -- whether it be a country or state.

Q    At some point in time, did he get laid off or lose that job?

A    He did.

Q    Where did you live when he got laid off?

A    We were in Jersey.

Melissa Davis - Direct

Q    New Jersey?

A    Yes.  New Jersey.

Q    So you moved from Staten Island?

A    Yes.

Q    At some point did you understand that he started his own company or companies?

A    Yes.

Q    Do you remember any of the names of the companies he started?

A    Mode and Vector Energy.

Q    Can you tell the jury, what was your role in sort of family finances, keeping track of the checkbook and the deposits and writing bills?

A    That wasn't my role.

Q    Was Mode successful?

A    No.

Q    At some point in time, did you move to Vermont?

A    Yes.

Q    And do you remember what year that was that you first moved to Vermont?

A    Yes.  The summer of two thousand -- I mean the winter of 2015, I think.

Q    Maybe I'll take you back.  You lived in Danville in January.

A    We moved in --

Melissa Davis - Direct

Q    How long -- when did you move to Danville?  How long were you living in Danville in January of 2018?

A    Two years -- I think two years.  I'm so sorry.  I think we moved at the -- the -- my daughter was born in '14.  We moved to Vermont 2015 around the springtime.

Q    Spring of 2015 --

A    Yes.

Q    -- is your recollection?

A    Yes.

Q    Before you moved to Vermont, where were you living?

A    New Jersey.

Q    Before you moved to Vermont, while you were living in New Jersey, was there an incident where Gregg asked you to look at a website on his computer?

A    Yes.

Q    Can you tell the jury what you remember about that incident.

A    My husband was on the phone.  He was angry.  I was with the children.  After he had settled down and he got off the phone, I went into his office to ask what was going on.  He sat me down and asked me to look at the computer.  It was a bank.  And he said, "What do you see?"  I didn't know what he was asking me.  So I kind of went through the -- the bank website, and then after a while, I realized it wasn't real, and I -- and I said, "I don't know what this is."  I said, "It's not real."

Melissa Davis - Direct

Q    When you first moved to Vermont, where did you move to? What town?

A    Bristol, Vermont.

Q    And why did you move to Vermont?

A    I wanted to give my kids a better upbringing.

Q    At that point in time, was Gregg still involved in working with Mode?

A    I think so.

Q    Was he at any other employment when you moved to Bristol?

A    He was Ubering.

Q    Ubering?  Being a driver?

A    Yes.

Q    At some point in time, did he get a different job in Vermont?

A    He did.

Q    And where did he get a job?

A    At Safety-Kleen.

Q    Safety-Kleen?

A    Yes.

Q    If you could speak up just a little bit --

A    I'm sorry.

Q    -- so I can hear you.

A    Safety-Kleen.

Q    Do you remember what he did at Safety-Kleen?

A    He -- environmental waste.  He was, like, I guess helping

Melissa Davis - Direct

to ensure that -- like, industry regulations.  I don't know. Something like that.

Q    Was he working at Safety-Kleen up until January 6th, the date that you last saw him?

A    Yes.

Q    While working at Safety-Kleen, did you hear him talk about Mode Commodities even after he began working at Safety-Kleen?

A    Yes.

Q    Did you hear any names from him come out of his mouth associated with his Mode Commodities work?

A    I did.

Q    What names did you hear?

A    Greg Gac, Serhat, and Murat.

Q    Ms. Davis, have you ever heard of Jerry Banks?  Before this case, I should say.

A    No.  No, I have not.

Q    Let me ask you, in January of 2018, had you ever heard of Aron Ethridge?

A    No.

Q    Had you ever heard of Berk Eratay?

A    No.

Q    Let me take you back to after Gregg left the house that night.  You said you didn't sleep much that night.  Can you tell the jury a little bit about what happened the day -- the next day, January 7th.

Melissa Davis - Direct

A    My mother-in-law and I called various --

MR. BALOGH:  Your Honor, I'm just going to object on relevance.

THE COURT:  I'll allow it.

Q    Briefly.  Briefly, Ms. Davis.

A    My mother-in-law and I, we called the U.S. Marshal's Office in Virginia, and we tried to find every single, like -- I don't know, like layover, and so we were just on the phone all day trying to find out where he was, because I just -- I knew he was arrested, and we were just trying to find out where exactly he was.

Q    What was your state of mind that day?

A    Anxious.

Q    Drawing your attention to the early morning hours of January 8th; that is, sort of in the night after the day after he left, did the police come to your property?

A    They did.

Q    How did you first learn about that?

A    The dog was barking again.  But this time I had to go check on him.  And when I went to the living room, I saw lights everywhere, and I thought they were returning Gregg, so I opened the door, and I said, "Where's my husband?"  And they said, "Ma'am, we had a call here a few nights ago.  We need to inspect your home."  So five or six of these police came in. They went all throughout the house, and the whole time I kept

Melissa Davis - Direct

just asking questions about Gregg, and then finally they said, "We'll" -- I said, "Where's my husband?" And they said, "Somebody's going to come in and speak to you," and two men in suits walked in with the advocate, and they told me, "Your husband is dead."

Q    Did -- were you interviewed in the early morning hours of that night?

A    I was.

Q    And was that interview recorded?

A    Yes, it was.

Q    And were you interviewed in -- the next day during the day on January 8th?

A    I was.

Q    And was that interview recorded?

A    It was.

Q    Have you had a chance to listen to those interviews prior to your testimony today?

A    I have.

Q    During the interviews, did you provide any names to the police?

A    I did.

Q    What names did you provide to the police?

A    Greg Gac, Serhat, and Murat.

Q    At some point in time before your husband left the house on January 6th, was there an unusual incident that happened on

Melissa Davis - Direct

your property that you recalled later?

A    Can you repeat that question?

Q    So he left the house on January 6th.

A    That's right.

Q    After this incident was over, after you were interviewed, did you remember an unusual incident that happened with respect to a person on your property a few weeks before?

A    Oh.  There was a gentleman.  Yes.  It was not just a few weeks before.  It was probably a month and a half.  It was fall time.  And there was a gentleman that was walking around our property, and it was around lunchtime.  I was making lunch. And I opened the door and I asked if I could help him, and he said he had lost his dog, and it was a -- what are those K-9s called?

Q    Excuse me?

A    German -- no, not German -- German shepherd.  And I told him I didn't know of any, our neighbors up the road has two, but I would -- I would let him know if I found -- if I found it, and he gave me a number.

Q    I'd like to bring you back to Exhibit 6.  There's a white car on the right-hand portion of that photograph.  Do you recognize that white car?

A    Yes.

Q    Whose car was that?

A    It was ours.

Melissa Davis - Direct

Q    Was that car -- where would that car typically live during the time -- in the fall, let's say, when that man came to the -- came to your house?

A    That would have been in the driveway, because that was our primary vehicle at the time.

Q    So did you get a different car between the time the man came and the time of --

A    Yes.

Q    -- your husband's murder?

A    Yes.

        MR. VAN DE GRAAF:  Did we get in Exhibit 7 yet or not?

        MS. THOMPSON-MORAN:  No.  Nor 6, Paul.

        MR. VAN DE GRAAF:  Your Honor, I'd move in Exhibit 6. I thought I did, but Erin says no.

        THE COURT:  Yes, it hasn't been admitted.

        MR. VAN DE GRAAF:  Move Exhibit 6.

        THE COURT:  Any objection?

        MR. BALOGH:  No, Your Honor.

        THE COURT:  It's admitted.

    (Government Exhibit 6 was received in evidence.)

Q    BY MR. VAN DE GRAAF:  If I can show next, Ms. Davis, for identification what's marked as Exhibit 7.  Do you see that on your screen?

A    I do now.

Q    What's depicted generally in Exhibit 7?

Melissa Davis - Direct

A    That's the Ford Expedition.  That was there that night.

Q    That was -- was the car --

MR. VAN DE GRAAF:  Well, Your Honor, I move the admission of Exhibit 7.

THE COURT:  Any objection?

MR. BALOGH:  No, Your Honor.

THE COURT:  It's admitted.

(Government Exhibit 7 was received in evidence.)

THE COURT:  So let's make sure that it's not shown to the jury until it's admitted.

COURTROOM DEPUTY:  Correct.

Q    BY MR. VAN DE GRAAF:  I think you were going to talk about this exhibit.  Hopefully the jury can see it now.  What's the car depicted in Exhibit 7?

A    Oh, sorry.  Ford Expedition.

Q    Is that where the car was parked the night of January 6th, to the best of your recollection?

A    It was.

Q    And I think this -- does this picture also depict the kitchen door that you referenced earlier that the man with the marshal's outfit was at?

A    It is.

Q    And is that door -- I'll circle it.  We're zooming in. And is that door behind the second pillar from the left?

A    It is.

Melissa Davis - Direct

Q    Next I'd like to show you what's marked for identification as Government Exhibit 9.  Do you recognize what's depicted in Exhibit 9?

A    That's the Dodge Durango that was --

Q    The car you had used regularly before you bought the Expedition?

A    Yes.

Q    And is that a fair depiction of the Dodge Durango?

A    It is.

        MR. VAN DE GRAAF:  Your Honor, I move the admission of Exhibit 9.

        THE COURT:  Any objection?

        MR. BALOGH:  No, Your Honor.

        THE COURT:  It's admitted.

    (Government Exhibit 9 was received in evidence.)

Q    BY MR. VAN DE GRAAF:  And next Exhibit 10.  Do you recognize what's depicted in Exhibit 10?

A    The license plate?

Q    For what vehicle?

A    The Dodge Durango.

Q    The Durango in Exhibit 9?

A    That's correct.

        MR. VAN DE GRAAF:  I move the admission of Exhibit 10, Your Honor.

        THE COURT:  Any objection?

Melissa Davis - Direct

MR. BALOGH:  No, Your Honor.

THE COURT:  It's admitted.

(Government Exhibit 10 was received in evidence.)

MR. VAN DE GRAAF:  And could you show the jury just for the record Vermont license plate GHD 103.

Q    BY MR. VAN DE GRAAF:  That was the license plate on the Durango at the time?

A    Correct.

Q    Ms. Davis, do you still live in Danville?

A    No.

Q    When did you move away?

A    Shortly after he died.

Q    After that first couple of interviews you did on January 8th, did you stay interested in the investigation concerning Gregg's death?

A    Of course.  I had to.

Q    At some point in time, did you learn that certain individuals were arrested in connection with Gregg's murder?

A    I did.

Q    At some point did you learn that the defendant, Serhat Gumrukcu, was arrested in connection with Gregg's murder?

A    I did.

Q    Did you take any legal action on your own after you learned that the defendant had been arrested?

A    I did.

Melissa Davis - Direct

Q    And why did you do that?

A    Can I say I felt he was guilty?

Q    Well, why did you take legal action?  Why did you -- what kind of legal action did you take?

A    A civil suit.

Q    And why did you do that?

A    Because I have the right to.

Q    What's that?

A    Because I have the right to.  I don't know how to answer that.

Q    What did you do between 2018 and the present financially for your family?  How have you been living?

MR. BALOGH:  Objection, Your Honor.  Relevance.

THE COURT:  I'll allow it.

A    My husband had a life insurance policy, and I've just been a frugal mom raising seven kids.

Q    Are you currently working right now?

A    No.  I'm trying to start a line.

Q    A what?

A    An herbal line.

Q    And are you going to school?

A    I am.

Q    What are you going to school for?

MR. BALOGH:  Objection, Your Honor.  Relevance.

THE COURT:  I'll -- let's move on to a different

Melissa Davis - Cross

topic, please.

MR. VAN DE GRAAF:  If I can have a moment, Your Honor.

THE COURT:  Yes.

MR. VAN DE GRAAF:  Nothing further for Ms. Davis, Your Honor.

THE COURT:  Any cross-examination?

MR. BALOGH:  Thank you.  It is my -- Ms. Ruddy, can you hook up Ms. Chahine for us?

COURTROOM DEPUTY:  I can do that.

MR. BALOGH:  Thank you.

COURTROOM DEPUTY:  It is currently on your screen now.

CROSS-EXAMINATION

BY MR. BALOGH:

Q    Good morning, Ms. Davis.  My name is Ethan Balogh.  I represent Serhat Gumrukcu.  I am sincerely sorry for your loss.

A    Thank you.

Q    You've been through a harrowing experience.  You're here today and you've taken the oath to tell the truth, to bear witness before our jury, correct?

A    Definitely.

Q    And I think you've explained you're a religious person.  That oath means something special to you, an oath to God?

A    Absolutely.

Q    And you're going to -- you can meet that oath today even if it's a little difficult?

Melissa Davis - Cross

A    I will.

Q    I'm not going to talk about the events of January 6.  I want to talk about other events, if that's okay.  I want to go back to the work history of your husband which you talked about.

    And when you met, you guys were living in Staten Island. He was a truck driver, right?

A    Um-hum.

    THE COURT:  Yes?

Q    That's a "yes"?

    THE COURT:  So when you say "um-hum" --

    THE WITNESS:  I'm sorry.

    THE COURT:  -- it could be "yes" or "no."

A    Yes.  Yes.

Q    And Mr. Davis, he did not attend college; is that correct?

A    He did.

Q    He did.  Did he graduate college?

A    He didn't.

Q    He didn't.  So -- how long did he go to college?

A    Two -- I think three years.  Junior.

Q    And then do you know why he dropped out?

A    To work in the business force.

Q    But he was working then as a truck driver when you met him; he wasn't in school if he was working as a truck driver, right?

Melissa Davis - Cross

A    That's correct.

Q    And his next job after that, you described how he was doing foreign investing in New York, correct?

A    That's right.

Q    And I think you said he had that job for about three years; is that right?

A    Yeah.

Q    And when he lost that job, he was unemployed for a while, correct?

A    That's right.

Q    And the family experienced some financial difficulties; you were evicted from a house --

A    We did.  We did.

THE COURT:  So one thing is let him get the question out --

THE WITNESS:  Oh, I'm sorry.

THE COURT:  -- even if you know where he's going with it, because our court reporter, every time a speaker changes, she has to flip it, and it creates this kind of messy transcript.

MR. BALOGH:  Thank you, Your Honor.  And I'll try to go slow and clearly.  I have a problem speaking fast.

Q    So I'm going to slow it down for clarity, and when I'm done, I'll give you a full opportunity.  I'll try not to interrupt you.  Okay, Ms. Davis?

Melissa Davis - Cross

A      Okay.

Q      Thank you.  So there was -- you were evicted from a home you had rented in Westfield, New Jersey; is that right?

A      That's correct.

Q      And you had then -- you had purchased a home in Plainfield, New Jersey, and you and Gregg lost that to foreclosure; is that right?

A      That's right.

Q      And when he was -- he was unemployed, he was trying to break into the oil business; is that right?

A      Yes, it was.

Q      I think you described that he was trying to hustle to get into it because if he could get in, it would be lucrative; is that right?

A      I guess I said that.  I don't know.

Q      And he --

A      Where is that quote from?  I'm sorry.

Q      That's okay.  We'll get there if I need to.

A      Okay.

Q      I'm not allowed to -- I'm supposed to just ask questions.
       The two companies he used over time, he had one called Vector Energy, right?

A      Yes.

Q      And he created another one called Mode Commodities, right?

A      Yes.

Melissa Davis - Cross

Q    And -- but he never succeeded in becoming an oil dealer; is that right?

A    Unfortunately, no.

Q    And he never closed any oil deals from the time he started through his passing; is that right?

A    No.

Q    He tried to make an oil deal with a guy named Robert.  Do you remember telling the investigators about Robert?

A    Yes.

Q    And that was -- that was a failed attempt when he was trying to be an oil distributor a couple of years before he was murdered; is that right?

A    That's correct.

Q    One of the things --

        MR. BALOGH:  Can we show the witness NN3.

        COURTROOM DEPUTY:  I did ask IT to come in because I could see you struggling a little bit.

        MS. CHAHINE:  Sorry.

        COURTROOM DEPUTY:  He should be right in.  He's on his way, I believe.

        MR. BALOGH:  NN3.

        THE COURT:  We have it up on the screen.  Mr. Balogh, we have it up on the screen.

        MR. BALOGH:  What's that?

        THE COURT:  We have it up on the screen.

Melissa Davis - Cross

MR. BALOGH:  Thank you, Your Honor.  Okay.  Can we -- pardon me, Your Honor.  Court's indulgence?

THE COURT:  Sure.

MR. BALOGH:  Try to get this on track.

THE COURT:  Here comes our IT specialist, who can fix any problem.

Q   So, Ms. Davis --

MR. VAN DE GRAAF:  Let's flip through this with Ms. Davis while my team tries to stay organized.

Q   Can you take a look at this.  And for the record, NN3 is a copy of Gregory Davis' and Melissa Davis' 1040 from 2015 that was extracted from Mr. Davis' phone and certified as authentic by the parties in stipulation?

THE COURT:  Are you moving to admit it?

MR. BALOGH:  Move to admit NN3.

THE COURT:  Any objection?

MR. VAN DE GRAAF:  Your Honor, I haven't gotten a copy of it.  I thought I was going to be getting a paper copy of the exhibits.  This was not on the defense exhibit list, I don't believe.

MR. BALOGH:  No.  It's impeachment, and it's from their production.

THE COURT:  Well, it doesn't matter where the production is.  Just show it to Mr. Van de Graaf, and when he's had an opportunity to look at it -- you're not moving to admit

Melissa Davis - Cross

it, then?

MR. BALOGH:  Yes, I am.

THE COURT:  Oh, you are.

MR. BALOGH:  And I just gave him a whole copy.

THE COURT:  All right.  Any objection, Mr. Van de Graaf?

MR. BALOGH:  And just for the record too, the only difference between this and the extraction is I've redacted out the couple's and children's Social Security numbers and their date of births pursuant to 49.1.  The other tax return's a shorter document.

MR. VAN DE GRAAF:  It's quite a lengthy document, Your Honor, that I haven't had a chance to look at, but I don't think we object to this document.

THE COURT:  All right.  NN3 is admitted.

(Defendant Exhibit NN3 was received in evidence.)

MR. BALOGH:  Thank you.  And why don't we publish it to the jury, if we may.  Is it on the screen?

COURTROOM DEPUTY:  It is, yes.

MR. BALOGH:  And so let's just orient the jury to where we are in the finances.

COURTROOM DEPUTY:  It should be on -- you're not seeing it?

THE JURORS:  No.

COURTROOM DEPUTY:  Let's try it again.  Is no one

Melissa Davis - Cross

seeing it?

JUROR:  Just this one.

MR. BALOGH:  Mr. Commo has it.  The jury box doesn't.

COURTROOM DEPUTY:  Hold on.  Let's try it this way. Anybody?  Okay.

THE COURT:  Everybody.

MR. BALOGH:  Thank you, Ms. Ruddy.

COURTROOM DEPUTY:  Yes.

Q    Ms. Davis, so on page one, just to orient our jury to where we are, this is the 2015 joint tax return you and your husband filed when you were living at the Briggs Hill address in Bristol; is that correct, ma'am?

A    Yes.

Q    And what happens here is in this document, for total income for 2015, there was 24,000 and change in salary and nearly $6,000 in business income; is that right?

A    That's what I see here, yes.

Q    Okay.

MR. BALOGH:  And why don't we go, if we can, Ms. Chahine, to page 11.

Q    Okay.  And what we're looking at here is this is a reflection of the five-year history of tax reports that you and your husband provided the IRS.  Do you see that, ma'am?

A    I can.

Q    And does this confirm your recollection that between 2011

Melissa Davis - Cross

and 2013 you and your husband reported no income whatsoever to the federal tax authorities?

A    I can't answer that question.  I didn't do the taxes.

Q    Okay.  But they were filed in your name, correct?

A    Well, in his name and mine, yes.

Q    Again, if we go to page one, it's Melissa Davis and Gregg Davis, correct?

A    Right.

Q    Married filing jointly, correct?

A    That's correct.

Q    And this document shows there's no claim of income in those three years, right?

A    That's what this documents says, yes.

Q    Then in 2014, the year before, it says it reports income of about $3400, correct?

A    That's correct.

Q    And then in 2015, it shows $30,000; is that right?

A    Yes.

Q    Okay.  And let's go to --

        THE COURT:  So let me ask the origin of this.  This can't be part of a tax return.  Is it?

        MR. BALOGH:  This is part of the tax return, and it is the whole tax return.  This is an extract of the 1040 filing that was taken from Mr. Davis' phone, and there's a 2016 filing.  It's a Turbo Tax filing that reflects a Turbo Tax

Melissa Davis - Cross

return that was saved and then produced to us as a correct extract from his telephone.

MR. VAN DE GRAAF:  I don't think it was -- was offered or -- there's nothing about the truth of this tax return, right?  It was found on a device.  But Mr. Balogh's wrong that the tax return includes these pages.  There's a variety of pages that Turbo Tax creates.  Whether somebody has to put their previous years on to their Turbo Tax return or not, I don't think that -- that's a requirement to fill out your year's tax return, so I just think that --

THE COURT:  So --

MR. VAN DE GRAAF:  -- the foundation for what this document means, this witness can't provide that foundation, and the document itself does not provide a foundation of what it means.

THE COURT:  So I should have been more precise.  NN3 I thought was a tax return.  It's not.  It's a complement of tax-related documents.  Is that fair to say?

MR. BALOGH:  No, no.  It's actually -- what it is, if you look -- I'll give you a paper copy when we have a moment. This is their 2015 tax return that they filed.  That's a page that's reflected on tax returns, prior tax years.  The "Tax History Report" page we're looking at is a standard form from the IRS.  It's part of a tax return, and so this is the tax return that -- this is the form it was in, and the form is one

Melissa Davis - Cross

electronic document, and it was labeled "2015 Turbo Tax Fed Return."  We've labeled it "Redacted" because we've taken out the PII and made no other changes except for the address, the numbers of the address.  49.1 precludes inclusion, and we comply with 49.1.

THE COURT:  So I think it may be a document that Turbo Tax generates.  I do not believe it is part of a standard tax return.  It doesn't make any difference.  It's been admitted.  But like everybody else here, I've filled out many tax returns, and I don't recall ever seeing this page, and I think that's what Mr. Van de Graaf's point is, that this appears to be something generated by Turbo Tax.  But we'll go forward on that basis.  In any event, it's been admitted.

MR. BALOGH:  Thank you, Your Honor.

Why don't we go to - and I'll tell you the page number - Schedule C.

Give me one second, Your Honor.  I thought I had the page number for Schedule C.

MR. VAN DE GRAAF:  Page three, Mr. Balogh.

MR. BALOGH:  Thank you.

Q   Can you take a look at page three.

MR. BALOGH:  Can we get that up there, Ms. Chahine.

Q   Okay.  And you see on page three this is a report of gross receipts for business income; is that right?

A   Yeah.  Profit or loss from business.

Melissa Davis - Cross

Q    Right.

A    Yes.

Q    And it only includes his income as an Uber driver operating under the name Raiser, LLC, correct?

A    Yes.

Q    But at the same time you're aware that Mr. -- your husband, Mr. Davis, received money from Mode from Serhat Gumrukcu in 2015, correct?

A    Yes, I did know that.

Q    And the way you understood, as I -- just let me be clear. You understood that Gac had a company named Quadrant; is that right?

A    Yes.

Q    And your husband had a company named Mode; is that right?

A    Correct.

Q    And when money was given for this deal or given to your husband, it was given to Mr. Gac at Quadrant, correct?

A    Yes.

Q    And then Mr. Gac would forward money to your husband at Mode, correct?

A    He was the mediator, right.

Q    And sometimes he would put money in the Mode account and sometimes he would put money in your personal account; is that right?

A    No, I don't know that.

Melissa Davis - Cross

MR. BALOGH: Okay. Why don't we show the witness for identification Exhibit II7. And for the record, II7 are TD Bank statements for the months April, May, and June -- actually, through the end of the year 2015. They're stipulated as business records of the bank. I provided them, and I ask they be admitted.

THE COURT: Any objection?

MR. VAN DE GRAAF: No, Your Honor.

THE COURT: They're admitted.

(Defendant Exhibit II7 was received in evidence.)

Q    BY MR. BALOGH: So working off of NN7, why don't you turn your attention to the first page --

MR. BALOGH: First, can we publish NN7?

MS. CHAHINE: II7.

THE COURT: So I thought you said II7.

MR. BALOGH: II7. You are correct, Your Honor.

THE COURT: Okay.

MR. BALOGH: It won't be the last time I jumble words. Thank you for fixing my record.

Q    So looking at II7 for the first -- and on page one, do you see those two $5,000 deposits on April 20th and April 24th? Do you see that?

A    I do see it.

Q    And you understood that $10,000 came from Serhat Gumrukcu, correct?

Melissa Davis - Cross

A    Yes.  If that's what you're saying.

Q    You -- the only money he ever received from Quadrant was money that was furnished by my client, correct?

A    That's -- I know it was from Greg Gac.

Q    And the only money he received from Greg Gac --

A    Would have been your client, yes.

Q    Okay.  So we see here, then, April 2020 -- April 2015, there's $10,000 of wires in the month of April, right?

A    Correct.

Q    Okay.  And can we go then to page six of this exhibit.  Do you see the middle of that page, Ms. Davis?

A    Yes.

Q    And do you see that there's additional wires that month, one for $5,000, one for $7,000, from Quadrant to Mode, correct?

A    I see that.

Q    And so that's an additional $12,000 in 2015, correct?

A    Yes.

Q    So now we've got a running total.  We're up to 22 grand in 2015 of business income to Mode provided by my client, right?

A    Yes.

        MR. BALOGH:  And why don't we turn to page 15, if we would, Ms. Chahine.  Thank you, Ms. Chahine.

Q    And do you see that before you, Ms. Davis?

A    I do.

Q    And that reflects an additional payment of $8,000 on the

Melissa Davis - Cross

8th *[sic]* of June, 2015, correct?

A     That is correct.

         MR. BALOGH:  And why don't we go to page -- hold on one second.  And can we show the witness II9 for identification.

    For the record, II9 are further TD Bank records that have been stipulated as business records.  They were obtained by the Government in this case.  I'm going to try to look if I have a paper copy.

Q     Do you see --

         MR. BALOGH:  Keep that there, Ms. Chahine, please.
    Move to admit II9.

         THE COURT:  Any objection?

         MR. VAN DE GRAAF:  Your Honor, I don't object to the first page of it.  By the way, we have not stipulated to the admissibility of these records.

         MR. BALOGH:  You said they were business records.

         MR. VAN DE GRAAF:  We haven't stipulated to them being business records.  I don't have any objection to the bank statements coming in, but this is not a complete bank statement, and there's a second page which is sort of a blowup --

         MR. BALOGH:  I think that's --

         MR. VAN DE GRAAF:  -- of a transaction.

         THE COURT:  So don't talk over each other.

Melissa Davis - Cross

Go ahead, Mr. Van de Graaf.

MR. VAN DE GRAAF:  To the extent he's trying to get in a bank statement, I have no objection to it coming in.  I just want you to know we haven't stipulated because I had not seen him identify this document previously.

MR. BALOGH:  I think that's the wrong II9.  That's the trial software version.  Let me tell you what II9 is, and I'll take it slowly.  That is not II9, the one I showed them.

Can you please take that down, Ms. Chahine.  That is not II9.

COURTROOM DEPUTY:  And that has not been published to the public or the jury.

MR. BALOGH:  Thank you so much, Ms. Ruddy.

Can I have a moment, Your Honor?

THE COURT:  You can.  We can break for lunch right now if that would help you.

MR. BALOGH:  That would be great.  I appreciate the dispensation.

THE COURT:  No problem.

Ladies and gentlemen of the jury, don't talk about the case.  Don't let anybody talk to you about the case.  Don't do any research.  I wish you a good lunch.  We will see you back here at 1 o'clock.  We can't start without you, so we will see you then.

Let's rise for the jury.

Melissa Davis - Cross

(Jury out at 11:51 AM.)

. . .

THE COURT: Mr. Balogh, I do not believe these documents are impeachment. I do not see that they're contradicting the witness' testimony, so they should have been disclosed. At this point I don't think it's a problem, but this is not a case in which she has testified to the contrary to anything I've seen so far.

MR. BALOGH: Okay. I was just trying to -- she testified about the subject matter of their finances, and --

THE COURT: Right.

MR. BALOGH: -- I'm filling it in, and what I plan to do now is show the checks that her husband -- the moneys that were paid to her husband and what they total through stipulated bank records.

THE COURT: Were those disclosed to the Government?

MR. BALOGH: We received them from the Government.

THE COURT: It doesn't -- you know the rule is were they on an exhibit list? Were they disclosed to the Government?

MR. BALOGH: We misunderstood. I'm getting them there now. I considered this impeachment of her testimony.

THE COURT: Well, she hasn't testified anything to the contrary, so I think they should have been on an exhibit list; they should have been provided to the Government. We would

Melissa Davis - Cross

have been able to ensure that they were full documents.  At this point it's not problematic, but it would prove problematic in the right instance.

MR. BALOGH:  We will make sure -- and one of the reasons too, Your Honor, when we did the stipulation about business records exceptions, we put all these banks on it.  Like, it was clear contextually that we were using them in this way.  I have a better understanding of what the Court wants, and I will endeavor to meet it to get them at least the bank records and the phone records.  We should be able to get those to them presently.

THE COURT:  All right.  So it's not just what I want.  It's what impeachment involves.

(Juror No. 15 entered the courtroom.)

MR. BALOGH:  I can finish that thought after this, Your Honor.  We can continue that.

. . .

THE COURT:  All right.  And we will take our own lunch break, but I'll let Mr. Balogh finish his thought.

MR. BALOGH:  Oh, the one thought, and this is -- it's part of the problem, we -- my understanding of the law is unless and until the Government gets by Rule 29, the only disclosure obligations we have as a matter of law are set forth in Rule 16 and that we have to provide the Government stuff we intend to use in our case in chief ahead of time, and that's

Melissa Davis - Cross

the limits on disclosure obligations where a defense attorney may properly be ordered to do.

In this case we were directed to provide witnesses and exhibits ahead of time. In every other trial I've done, and we've done a lot, I normally object and tell the judge, "Not going to happen, and you'll put me in jail before it happens." No judge has accepted that and say -- understanding the rule, which is I don't have to do anything.

What we did was we understood the Court was saying, "This is how we have local rules. This is how we do it here in Vermont. We give notice." And so in that spirit, as opposed to pushing up and saying, "You can't legitimately, Judge, ask me to disclose my case until their case is over" --

THE COURT: That's not disclosing your case.

MR. BALOGH: But I'm making my point, Your Honor. I'm not trying to be offensive in any way. We took the effort to meet the order. For the first time in my career, we didn't step up and push back, and we did our best efforts understanding that this is their evidence and we're not surprising them with it.

I understand the Court's ruling better now, and I'm going to endeavor to get everything to them as soon as I can. I think there was a difference. But I wanted to put it in that context of I understood in all the trials I have, I've never had a jurist say I have to tell the Government any exhibit I'm

Melissa Davis - Cross

going to show that witness because it's not my case in chief. It's their witness, and especially when I'm using their evidence to examine their witness.

THE COURT:  So I'm not asking you to show the Government your impeachment evidence prior to using it.  You actually specifically asked for an order making it reciprocal that the parties tell each other what documents are going to be used with each witness.

MR. BALOGH:  Oh, no, no, no.  No.  You misunderstood, Your Honor.

THE COURT:  And -- and -- let me finish.  If this was true impeachment, which is what you told me it was offered for, I would expect it to contradict something she said on direct or something she's saying to you.  I don't see it that way.

MR. BALOGH:  Okay.  I understood -- the reciprocity we talked about was a different thing.  That means when we get to our case in chief, we told the Government we're going to do the same dispensation they gave us, 48 hours' notice of the witnesses we're going to call, 48 hours' notice of the exhibits we're going to use with our witnesses.  That has nothing to do with our defense of their case in chief.  Their case in chief, they're giving us notice of who's coming, and we're preparing them serially to meet the testimony they have.

THE COURT:  I'm saying that because you just told me that you've never provided any exhibits or witnesses to the

Melissa Davis - Cross

Government previously in any other case, and this would be inconsistent with this 48-hour rule.  It's a minor point.  Let's -- let's go to lunch.  I get over things very easily.  I will see you back here at 1:00.

Anything to bring to my attention?

MR. VAN DE GRAAF:  Your Honor, I just wanted to comment on one thing, which is presumably he can cross Ms. Davis if he's using these documents to show that she's a liar.

THE COURT:  Right.

MR. VAN DE GRAAF:  Right?  It doesn't have to directly contradict.  He can say, "You filed a false tax return, didn't you?"  I mean, I think he could do that if that's what he's trying to do.  If he's trying to attack Gregg Davis for Gregg Davis doing something wrong, then I don't think he should do it through this witness.

THE COURT:  Well, she's on the tax return, and so that's fair game in terms of -- I guess if the point is - it was lost on me - that it's a false tax return, then it is more like impeachment.

MR. VAN DE GRAAF:  And to the extent he's doing that, I don't see a problem with using --

THE COURT:  I agree.

MR. VAN DE GRAAF:  -- tax returns to impeach Ms. Davis.

Melissa Davis - Cross

MR. BALOGH:  Right now all I'm doing is she testified on the subject matters of their finances and their money.  They introduced that issue.  And now I'm introducing additional evidence on that issue that presents it more fairly and accurately.  However that's framed, that's what we're entitled to do.  They brought up a subject matter, finances, and moneys received or not received from my client, and then the question is:  What's a true statement of their finances at the time and what moneys did she actually -- did he actually receive?

She might not know about all the moneys, but we're going to use bank accounts that were obtained by the United States to just show your husband received these -- Mode got these moneys on these dates; Mr. Davis got these moneys on these dates.  I try not to argue the conclusion --

THE COURT:  So none of that is impermissible.  We all agree that's not the problem.  The problem was I issued a pretrial order.  I required you to disclose exhibits, not impeachment, not rebuttal.  You told me you were offering it for impeachment.  I didn't see the impeachment.  Then we got into an argument about what's impeachment.  Mr. Van de Graaf weighed in on your side in terms of the accuracy of the tax return.  This is not something that's particularly problematic.

MR. BALOGH:  Okay.  Thank you.

THE COURT:  I will see you at 1:00.

MR. BALOGH:  Thank you, Your Honor.

Melissa Davis - Cross

(A lunch recess was taken from 12:18-1:05 PM.)

THE COURT:  I understand there's no issues.

Let's bring back the jurors.

MR. BALOGH:  That's correct, Your Honor.

THE COURT:  Yes.

(Jury in at 1:11 PM.)

THE COURT:  We are back on the record in United States of America v. Serhat Gumrukcu.  We have Melissa Davis on the witness stand.  She is still under oath, and we are in Mr. Balogh's cross-examination.

And you may resume.

MR. BALOGH:  Thank you, Your Honor.  Just give me one more second, please.

THE COURT:  Sure.

Q    BY MR. BALOGH:  When we were last here -- pardon me, Ms. Davis.

When we were -- before the lunch break, we were talking about payments to your husband's company, Mode, in 2017, and we had shown 10,000 in April, 12,000 in May, and 8,000 in June 2015.  Are we orientated in time, Miss?

A    Yes, sir.

Q    Okay.  The next thing I'd like to show you, if I may, is --

MR. BALOGH:  Can we put on the screen II9 -- actually, no, let's not do that.  Let's go to II8.  Let's put up II8, if

Melissa Davis - Cross

we may.

MS. CHAHINE:  II . . . ?

MR. BALOGH:  8.  That should be -- is that the Wells Fargo bank statements?

Q    Showing the witness what's been marked for the purposes of identification as II8 --

COURTROOM DEPUTY:  One second, Mr. Balogh.  I'm not seeing anything.

Did you connect through the back?

MS. CHAHINE:  I plugged in the same HDMI cord I used before.  I'm really sorry about all of this delay.

MR. VAN DE GRAAF:  While we're waiting, Your Honor, I think you did give me a copy of this, but I'm going to object to Ms. Davis being cross-examined about Mr. Gac's financial records.

THE COURT:  Mr. Gac's financial records?

MR. VAN DE GRAAF:  That's what II8 is, so I -- to the extent he was going to be using it, I thought that was beyond the scope of direct.

MR. BALOGH:  May I have a moment, Your Honor?

THE COURT:  Sure.

MR. BALOGH:  First I want to -- before I ask a question, I want to admit II8, which is bank records from -- for Quadrant Financial Group, LLC, and these are from the -- bear the dates in this exhibit from the 1st of January, 2015,

Melissa Davis - Cross

through the 30th of June, 2016, and so since they're bank records, I'd ask them to be admitted into evidence.

MR. VAN DE GRAAF:  I don't think they're relevant at this point in time.  If he wants to admit them in his case in chief, that's a different question, but I think during Ms. Davis' testimony it's not the appropriate time to admit these documents.

THE COURT:  So let's have a proffer as to foundation and why it's within the scope of the direct examination.

MR. BALOGH:  Okay.  The foundation is they're business records of Wells Fargo Bank, and the parties agree that they're authentic business records and they are what they purport to be.  So that's why they're being offered into evidence, because they have relevant evidence of payments that both Quadrant received from my client and payments that Quadrant made to Mr. Davis --

THE COURT:  So I'm not doubting that they're -- authenticity is not the issue.  How is this witness able to supply any foundation, recognize the records and say "I'm familiar with them"?  She didn't testify about Mr. Gac's finances on direct examination, and there's no basis that she has any knowledge about them.

MR. BALOGH:  Well, there's two parts.  The authenticity has been stipulated to.

THE COURT:  I'm not worried about that.

Melissa Davis - Cross

MR. BALOGH:  So the record -- it's submitted as a business record, so I want to get them in.  You're asking me, I think, what questions I'm going to ask the witness once they get in.

THE COURT:  No.  I'm not going to admit them at this point in time because there's no foundation, and they appear to be outside the scope of the direct examination.  You may question the witness and establish that and then move to admit them again.

MR. BALOGH:  Okay.

THE COURT:  Go ahead, please.

Q    BY MR. BALOGH:  Are you familiar that in December of 2015 your husband also received two additional payments of -- totaling $10,000 from Quadrant based on moneys received from my client?  Were you aware of that?

A    Yes, sir.

MR. BALOGH:  Okay.  So with that admission, I'd first move to admit II8, which is a stipulated bank record.

THE COURT:  And go ahead, Mr. Van de Graaf.

MR. VAN DE GRAAF:  She's admitted a fact.  I don't think we need records to come in if she's admitted the fact.

THE COURT:  Well, I'll allow it if these are the records that show it going from one bank account to another.

MR. BALOGH:  That's what they show.

THE COURT:  All right.  II8 is admitted.

Melissa Davis - Cross

MR. BALOGH:  Thank you.

(Defendant Exhibit II8 was received in evidence.)

MR. BALOGH:  And if you would, please, Ms. Chahine, would you forward to the 12/4/2015 portion of it on Bates 148 -- 4185.

COURTROOM DEPUTY:  I tend to think that --

MS. CHAHINE:  I do not believe I'm connected to this.

COURTROOM DEPUTY:  I don't think you are either, because nothing's showing.

MS. CHAHINE:  I am plugged into the HDMI on this side.

COURTROOM DEPUTY:  Okay.  So you're on.

MS. CHAHINE:  Again, apologies for the technical difficulties.  Appreciate your patience.

COURTROOM DEPUTY:  And if you were showing II8, and it's admitted, everybody is able to view your screen at this point.  Okay?

MS. CHAHINE:  Okay.

MR. BALOGH:  Thank you, Ms. Ruddy.

THE COURT:  But we're not seeing anything on the screen.  There it is.

MR. BALOGH:  We're getting there.  We're almost there. I just hope for all the kinks to work out today, Your Honor.

COURTROOM DEPUTY:  And that appears to not be numbered II8.

MR. BALOGH:  That's II7.  It's also been admitted, but

Melissa Davis - Cross

we need to show II8.

THE COURT:  If you have a paper copy, we can just open up the ELMO and do it that way.

MR. BALOGH:  Why don't we open up an ELMO while my team continues to work and see if we can speed this along, Your Honor.  Thank you.

COURTROOM DEPUTY:  All right.  So it should be on you.

MR. BALOGH:  I've just got to get to the right page.  One more moment.  Court's indulgence, Your Honor.

Q    BY MR. BALOGH:  I'm going to show you page 50 of II8.

MR. BALOGH:  Thank you, Ms. Ruddy.

COURTROOM DEPUTY:  It has an auto focus.  I didn't show you a tutorial on this.

MR. BALOGH:  Show me how to do this.

COURTROOM DEPUTY:  It should auto focus, and if it doesn't --

MR. BALOGH:  There we go.

COURTROOM DEPUTY:  And you can touch that screen and circle and highlight.

MR. BALOGH:  Oh, beautiful.

COURTROOM DEPUTY:  I will clear for you.

MR. BALOGH:  Thank you.

Q    So now just to orient the jury - again, apologies for our tech; we're going to get there - this is page 50 of Exhibit II8.  This is a bank account statement from Quadrant, Greg

Melissa Davis - Cross

Gac's company.  And I want to show your attention here on the 4th.  First there's a wire that goes to Mode Communications for $5,000.  Do you see that?

A     Yes, I -- yes, sir.

Q     So -- and then on the same day, there's a wire from Quadrant to Gregg Davis directly.  You see that?

A     Yes, sir.

Q     And those -- you understand that to be in December of 2015 that your husband received another $10,000 from our client; is that right?

A     Yes, sir.

Q     So that is $47,000 -- well, let's just do the math slowly together.

      So that was ten in April, 12 in May, eight in June, and this is another ten.  That is $40,000, right?

A     Yes, sir.

Q     Okay.  Now, why don't we then go to -- we go a little further down in here.  There's $35,000 from Quadrant to Mode later that month.  Do you see that?

A     Yes, sir.

Q     So we add that to the total.  That's $65,000 for 2015, right?

A     Yes, sir.

Q     And you and your husband used those moneys for -- to support your lifestyle, to deal with finances, to take care of

Melissa Davis - Cross

your kids, right?

A    Yes, sir.

Q    Mr. -- your husband did not provide any oil or any other property or anything else to Mr. Gumrukcu in exchange for the $65,000, did he?

        MR. VAN DE GRAAF:  Objection.  Lack of foundation for her knowledge.

A    I don't believe --

        THE COURT:  We'll see if she can answer.  But don't talk over each other.

Q    Why don't you tell the jury what your husband did in exchange for that $65,000.  What property or product did he give to Mr. Gumrukcu or anybody else?

A    I -- I can't answer that question.  I honestly don't know the details of their workings.  That is the -- that is an honest answer.

Q    And --

A    I was not -- I was not part of the transactions nor the business side of it.  I was his wife.

Q    And you understood that your husband didn't put any money into the transaction, though, correct?

A    I do believe -- yes.  Yes, sir.

Q    And you do understand that your husband received, at least in 2015, $65,000?

A    Yes, sir.

Melissa Davis - Cross

Q    Okay.  And the money was just, in 2015, directional; everything came to your husband; nothing -- you don't know of any money going back, correct?

A    I do not, no.  I do not, sir.

Q    Okay.  Let's go to 2016, if we can.

        MR. BALOGH:  And would you put on the screen just for the witness II10.  I've already provided a copy to my colleagues.

    And for the record, II10 are Mode Communications' TD Bank statements from August 15th, 2015, to November 28th, 2016.

Q    Please let me know when you see that.

A    Yes.

        COURTROOM DEPUTY:  Okay.  That's the wrong one.  That says II7.

        MR. BALOGH:  You've got to go to II10.

    May I approach the witness, Your Honor?

        THE COURT:  Yes, you may.

Q    Okay.  Ms. Davis, I'm going to hand you for a moment II10, which is Mode Communications' records on the date.  Please take a look at those and let me know if you're familiar with those as statements from TD Bank regarding your husband's business account for Mode Communications.

A    Can you please -- I'm sorry.  What am I looking for?

Q    To confirm those are your husband's bank records from TD Bank for Mode Communications.

Melissa Davis - Cross

A     I would say yes.

MR. BALOGH:  Move to admit II10.

THE COURT:  Any --

MR. VAN DE GRAAF:  No objection.  But it's Mode Commodities, not Mode Communications.

MR. BALOGH:  Thank you, Mr. Van de Graaf.  You'll be correcting me again, I'm sure.

THE COURT:  II10 is admitted.

MR. BALOGH:  Thank you so much.

(Defendant Exhibit II10 was received in evidence.)

Q     BY MR. BALOGH:  And so for II10, this is now going to address moneys received in 2016.  I'm going to put before you --

COURTROOM DEPUTY:  It might take a second to switch, but it should switch over.

THE COURT:  So the ELMO's on you, Mr. Balogh.

MR. BALOGH:  Thank you, Your Honor.  I just want to get the page.  We had it sorted for the computer, and we're obviously not flowing as much as we want.

Q     I'm showing you the first page of the May statement from TD Bank.  Do you see it in front of you, ma'am?

A     I do.

Q     Okay.  And this document reflects a $75,000 wire for 2016 to your husband's company from Greg Gac, correct?

A     Yes, sir.

Melissa Davis - Cross

Q    And you understood those were moneys received from Serhat Gumrukcu, correct?

A    Yes, sir.

Q    And you can't identify any money, property, or commodity that your husband provided Mr. Gumrukcu or any other person or entity in exchange for those moneys, can you?

A    No, sir.

MR. BALOGH:  Okay.  Thank you for clearing the screen for me, Ms. Ruddy.

Q    Now I want to show you --

MR. BALOGH:  Can you show the witness NN7.

MS. CHAHINE:  We are not connected to the Internet.

MR. BALOGH:  Then that's a no.

May I approach, Your Honor?

THE COURT:  You may.

MR. BALOGH:  Thank you.  Approaching the witness and handing the witness what's been marked NN7 for the purposes of identification.

For the record, it's labeled "2016 U.S. Individual Tax Return" in the names of Melissa Davis and Gregg Davis redacted for 49.1 compliance.

Q    Let me know when you've had a chance to review it and when you can confirm that this is a copy of your 2016 tax statements prepared by your husband and filed with the government.

A    Yes, sir.

Melissa Davis - Cross

MR. BALOGH:  Move to admit NN7.

THE COURT:  Any objection?

MR. VAN DE GRAAF:  No, Your Honor.

THE COURT:  It's admitted.

(Defendant Exhibit NN7 was received in evidence.)

MR. BALOGH:  Okay.  And so why don't we -- I'm going to stay with the ELMO, if I may, Ms. Ruddy.

COURTROOM DEPUTY:  Okay.  And it might take a second to trans- -- there we go.

MR. BALOGH:  I'm trying to make patience my virtue.

Q    BY MR. BALOGH:  So we can see here this is a tax return, and in the prior year -- unlike the prior year, 2016 in wages from Safety-Kleen totaled more than $83,000, right?

A    Correct, sir.

Q    And if we go actually -- do you have a copy in front of you?

A    I do, yes.

Q    Can you go through it and identify for us whether you and your husband reported any business income from Mode Commodities for 2016?

A    Can you please help me?  Where would I -- where would I find that?

THE COURT:  So would this -- you said she and her husband.  Is she on this tax return too?

MR. BALOGH:  Yes, ma'am.

Melissa Davis - Cross

THE COURT:  Okay.  Thank you.

MR. BALOGH:  It's a joint return.  Married filing jointly.

Q    I'll ask the question a different way since that was poor. Isn't it true that the tax return we've given you as the exhibit that we received doesn't include any business income for Mode Commodities or Vector Energy from your husband reporting that income to the IRS, right?

A    No.  I don't -- can you tell me where to find it on the -- on the sheet?  Where would I look for that moneys?

Q    Well, I would put it this way.

A    I see salary here.

Q    There is no business income form listing moneys from Mode or Vector Energy included in this tax return.

A    So then it's no, sir.

Q    No, it's not included, correct?

A    Right.  I didn't know if I was looking for it.

Q    That's -- that's a very fair question.  So now we have $65,000 in 2015, $75,000 in 2016.  Then you get more money in 2017; is that right?  Let me ask it a different way.

MR. BALOGH:  One more moment, Your Honor.  This is the last banking document of this examination.  We should go smoother afterwards.

Q    Are you aware that your husband received -- withdrawn.

Are you aware that your husband received two $20,000 --

Melissa Davis - Cross

two wires, each for $20,000, from Quadrant in May of 2017 totaling $40,000?

A    Yes, sir.

Q    And are you aware that in -- on November 28, 2017, your husband received an additional $50,000 from Quadrant?

A    Can you please repeat that?

Q    Yes, I can.  On the 28th of November, 2017, your husband received an additional $50,000 from Quadrant that had been provided by my client, correct?

A    I don't know with that one.

Q    You told the Government that there was a $40,000 and a $75,000 -- withdrawn.

You told the investigating officers who were both Vermont State Police and Special Agent Patrick Hanna that you were aware of payments your husband received in 2017.  Do you remember --

A    That's correct.

Q    And that was on the tapes.  When you listened to the tapes to prepare today, you relistened to what you told the police, right?

A    Yes, sir.

Q    And one of the things you told them about was that $40,000 that we just chatted about, right?

         MR. VAN DE GRAAF:  Your Honor, I object.  He didn't ask 40,000.  He said $50,000.  So --

Melissa Davis - Cross

MR. BALOGH:  I said two deposits for 20.  We're going to get to November.  We're talking about May.

Q    You told them there was two payments.  One was for $40,000 like the two $20,000 deposits we just talked about?

A    What I said when they had interviewed me was I remember a time when Gac had given my husband, Gregg Davis, $10,000 increments, and I believe that was when we first moved to Vermont, which would have been 2015, so that's the only 40,000. It was 10,000 increments.  That's what I remember.

Q    Okay.  Do you remember telling the Government, "So when we had the 40,000, 75" -- do you remember telling -- withdrawn.

Do you remember telling the Government that the 40,000 and the 70 you saw in his Mode account at TD Bank?  Do you remember saying that?

A    No, I do not remember.  No, sir.

Q    That's fine.  So you have no recollection of your husband receiving $50,000 in November 2017?

A    I do not remember 50,000.  No, I do not.

Q    Now, one of the things I wanted to talk about, if I may, is in addition to the names you provided, that when you were talking to your husband about his businesses, you expressed concern that he was going to get in trouble for fraud; isn't that true?

A    I thought the industry that he was trying to get in was a serious concern.  Would he get in trouble for fraud because of

Melissa Davis - Cross

who he is or because of the industry that he's working in?

Yes, it's the latter.

Q    Didn't you just -- didn't you often accuse him, though, saying that he was going to go to jail?

A    I never said my husband was going to go to jail.

          MR. BALOGH:  Okay.  May I approach the witness?

          THE COURT:  You may.

          MR. BALOGH:  And I'm going to hand the witness what's been marked as NN15, cell phone extractions from telephone of decedent, Gregg Davis.

Q    Do you see that document in front of you, Miss?

A    Yes, I do.

Q    Okay.  I'm going to turn your attention -- don't read anything into the record, and we're going to do it by the numbers.  Can you go to item entry 37 and read it to yourself.

A    I see that.

Q    Can you go to number 38; read it to yourself.

A    I see that.

Q    When you scroll up, at the top of that page, can you look at entry number 34.  Please read it to yourself.

A    I read.

Q    And the last one I'm going to ask you to read ahead of time, can you read number 16, the entry on 16, and read it to yourself.

A    I read that.

Melissa Davis - Cross

Q    Okay.  Now, does that review -- and those are text messages you had sent to your husband years ago, correct?

A    But -- I know.  And you asked me a question, and what you have shown me is something that is personal between a husband and a wife.  So when you had asked me that question, I have never, ever publicly said that.

Q    And that's why I didn't have you read them in, because I wanted to be respectful.

A    Please.

Q    So let me ask my question again broadly.  I didn't seek to introduce this evidence, and I don't want to.  It's not the purpose of it.  What I want to establish clearly so our jury just understands, that one of the things that happened in your marriage is at times you expressed concern to your husband that based on his conduct, long before he met Serhat Gumrukcu, that you had genuine fears he would be taken to jail for fraud and taking other people's money.  Didn't you express that to your husband, Ms. Davis?

A    Based on what I read, yes, I did have concerns that he could get -- he could -- he could get in trouble, but I don't think I just read anything about fraud.  I said because of the industry and the shady people, I wanted him to get out of it.

Q    Okay.  You specifically, now I want to talk about, expressed concerns about legal troubles that he had with a man named Colin Wolfe, correct?

Melissa Davis - Cross

A     Yes.

Q     And he had taken money from Mr. Wolfe, correct?

A     Yes, sir.

Q     And Mr. Wolfe said he didn't pay him back, right?

A     Yes, sir.  Of what I know.

Q     And Mr. Wolfe sued him, correct?

A     No, sir, I didn't know that.

Q     Might it be of assistance to you if I showed you some court documents to see if that refreshes your recollection of what you might or might not have known way back when?

A     Yes, sir.

Q     Thank you.

          MR. BALOGH:  Approaching the witness with NN4 -- is that all right, Your Honor?

          THE COURT:  NN4?

          MR. BALOGH:  NN4.

          THE COURT:  If that's what you're telling me it is, that's fine.

          MR. BALOGH:  I was more concerned about approaching the witness.

          THE COURT:  Oh, yes.  You may approach the witness.

          MR. BALOGH:  Thank you, Your Honor.

Q     Can you take a look at NN4.  Peruse the entire document. Let me know when you've had a sufficient opportunity, please, Ms. Davis.

Melissa Davis - Cross

A     Yes, sir.

Q     Have you had the opportunity?

A     Oh, yes, I have.

Q     That's all right.  I was just being overly patient.

Does that -- after reviewing the court filings we provided to you, do you have a recollection of your husband being the subject of a lawsuit with Colin Wolfe for the moneys he took from Colin Wolfe?

A     I knew of that transaction.  I did not understand that there was a legal engagement between the two.

Q     Okay.  And you were -- were you aware that he was sued?

A     That my husband was sued?

Q     Yes.

A     Yes.

Q     Were you aware that there was a default judgment entered in his -- against him in the favor of Mr. Wolfe for the money your husband took from Mr. Wolfe?

A     I did not.  What do you mean a "default"?

Q     If you didn't know, again --

A     Okay.

Q     -- we got to go for the protocol.

A     Sorry.

Q     Isn't it true that you told your husband that he was going to go to jail based on his business -- his business with Colin and that you were going to call the Feds on him?

Melissa Davis - Cross

A    You showed a text of a distraught wife trying to get her husband to stop going down a path that was not productive.

Q    So let me ask my --

A    So to --

Q    Please.

THE COURT:  So let her finish her answer.

A    To phrase that is, with all due respect, disingenuous.

Q    Can you say that again, please?

A    Disingenuous.  It is a conversation that we had very private.

Q    I just want to make sure the jury understands what was said in the private conversation --

A    In a text.

Q    In a text.  In this text, you said your husband was going to get in trouble for what he did to Mr. Wolfe, and you personally threatened to call the Feds on your husband; isn't that a true statement of what you wrote to your husband in 2013 about Mr. Wolfe?

A    I was behaving like a foolish wife.  You are correct.

Q    The next thing I want to talk to you about is about a month after my client was charged, you sued him, correct?

A    That's correct.

Q    And you later sued his husband too, correct?

A    That's correct.

Q    And you had no basis to sue his husband, did you?

Melissa Davis - Cross

MR. VAN DE GRAAF:  Objection, Your Honor.

THE COURT:  Basis?

MR. VAN DE GRAAF:  Foundation.

THE COURT:  I'll allow it.

A    I'm sorry.  Did I have a reason --

Q    You had no basis to sue his husband, did you?

A    It's a woman's instinct.

Q    And the reason you had the lawsuit and the Government asked you about it is for one reason:  You want money, right?

A    That's incorrect.

Q    So your lawsuit is seeking money, though, right?

A    Yes, it is.

Q    And the lawsuit doesn't seek anything other than money, does it?

A    That's correct.

MR. BALOGH:  Might I have one moment, Your Honor?

THE COURT:  You may.

MR. BALOGH:  Thank you.

We will tender Ms. Davis back to the prosecution.

Thank you, Ms. Davis, and again, sincere.

THE WITNESS:  Thank you.

THE COURT:  Any redirect?

MR. VAN DE GRAAF:  A few questions, Your Honor.

/  /  /

/  /  /

Melissa Davis - Redirect

REDIRECT EXAMINATION

BY MR. VAN DE GRAAF:

Q    Ms. Davis, Mr. Balogh asked you about suing the defendant's husband.

A    Yes.

Q    Are you working with lawyers in that lawsuit?

A    I am.

Q    And isn't it correct that your lawyers advised you to sue Mr. -- the defendant's husband because they were alleging that there was a fraudulent conveyance of assets to --

        MR. BALOGH:  I'm objecting to leading, and I'm objecting to attorney-client privilege, and if we're going to open the door to that with the lawyers here, let's make sure we're opening the door to privilege.  Otherwise, I just maintain the one objection.

        THE COURT:  So it is leading.  You may ask her what's the basis for the suing of the husband.  If she can answer it, she can answer it.  If she can't, she can't.

Q    Do you remember why you filed documents in court alleging a claim against the defendant's husband?

A    I honestly can't speak to it in too much detail, but I do know that Mr. -- his -- the husband submitted some fraudulent documents, and that was the precursor.

Q    Now, Mr. Balogh asked you a lot of questions about finances and your family's finances.  Did you have any

Melissa Davis - Recross

involvement in the preparation of the tax returns?

A    No, I didn't.

Q    Did you review the tax returns before they were filed?

A    I -- no, I didn't.

THE COURT:  Any recross?

MR. BALOGH:  Sure.

RECROSS-EXAMINATION

BY MR. BALOGH:

Q    I assume, then, you're aware that the allegations raised against Mr. Wittekind were dismissed as unfounded; isn't that right?

A    No, I didn't know that.  Or if I did, I don't -- I'm -- with all due respect, I don't think I knew that.

Q    That's fine.

MR. BALOGH:  Thank you, Your Honor.

THE COURT:  Any redirect?

MR. VAN DE GRAAF:  No, Your Honor.

THE COURT:  Thank you.  You may step down.

(The witness was excused.)

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


March 21, 2025                    Johanna Masse  Digitally signed by Johanna Masse
                                               Date: 2025.03.21 21:34:24 -04'00'
                                 _____
                                 Johanna Massé, RMR, CRR